IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| THE ACHIEVABLE, INC., ) | |
| ) | |
| Defendant/Appellant, ) | |
| v. ) | CASE NO. 2:11-cv-678-MEF |
| ) | [WO – Do Not Publish] |
| DANIEL G. HAMM, ) | |
| ) | |
| Plaintiff/Appellee. ) | |

## MEMORANDUM OPINION AND ORDER

This case is before the Court as an interlocutory appeal from the Bankruptcy Court's denial of Defendant/Appellant's motion to compel arbitration over certain adversary claims filed by the Plaintiff/Appellee Daniel G. Hamm (the "Trustee"), in his capacity as Trustee of the bankruptcy estate of Keith A. Nelms, who filed a voluntary bankruptcy petition under Chapter 7 of the Bankruptcy Code, Bankr. No. 10-30631. The decision of the Bankruptcy Court is due to be **AFFIRMED** on the grounds stated herein.

### I. BACKGROUND

Two of Nelms's entities are Allegro Financial Services, LLC, and Allegro Law, LLC (collectively "Allegro"). The Trustee filed adversary complaints (Doc. # 2-1; Doc. # 2-1 (Case No. 2:11cv678))[1] asserting five causes of action against Defendants/Appellants AmeriCorp, Inc. ("AmeriCorp"), Seton, Inc. ("Seton"), Timothy McCallan ("McCallan"),

---

[1] This opinion addresses the motion to compel arbitration filed by The Achievable. (Doc. # 2-2.) References and citations to the Complaint will be from Case No. 2:11cv678.

and The Achievable, Inc. ("The Achievable").[2]  Two of those causes of action, the first and fifth, are styled as "Turnover of Estate Property" and "Accounting," respectively.  In moving to compel arbitration, The Achievable re-characterizes these claims as simply a breach of contract cause of action and request for discovery related thereto.

In order to understand the precise nature of the Trustee's claims, it is necessary to catalogue briefly the development of the Allegro business and of The Achievable's alleged role in that business.

The Allegro entities were created and operated by an attorney named Keith Nelms starting in 2008.[3]  Allegro's business venture was debt elimination.  The Trustee describes the scheme in the Complaint as, "at best, an aggressive form of debt management in which consumers stop paying all of their unsecured debts in an attempt to have their creditors agree to a reduced settlement." (Compl. ¶ 37.)  At worst, it is personal economic suicide; debtors who are already fighting to keep themselves from sinking are strapped to an anchor on the

---

[2] McCallan is the owner and chief executive officer of The Achievable.

[3] Although Nelms, as a lawyer licensed to practice law in Alabama, is a necessary frontman to the Allegro debt settlement scheme, it is alleged that McCallan is the architect of the enterprise.  Prior to Allegro's inception, the Trustee alleges that McCallan operated a similar scheme in Florida – named the "Hess-Kennedy" scheme – until the Florida Attorney General obtained a permanent injunction against Hess-Kennedy.  When Allegro began operating its business, it is alleged that many (thousands) of customers in the Hess-Kennedy program were transferred to Allegro.  Concerning Nelms's and McCallan's respective roles, the Bankruptcy Judge made the following observation:  "I have had Mr. Nelms on the stand a couple of times and, you know, he gets very angry with me when I speak my mind but I guess I will speak plainly.  I don't think he had the brains to do all of this frankly.  Maybe I am wrong, but he didn't really seem to have a really good idea of what was going on here." (Tr. of Hr'g on Mot. to Compel (Doc. # 2-11).)

illusory promise that the water will recede. The very likely outcome of pursuing debt elimination in this fashion is a creditor's decision not to accept any settlement offers. The consumer is left with more money owed – due to increased interest, late fees, and penalties on accounts not being paid – and lower credit scores for their induced delinquency. In addition, the debt settlement firms take a hefty cut as fees of whatever payments the consumer sends directly to them.

The Trustee's Complaint alleges that The Achievable contracted with Allegro to provide services associated with advertising, marketing, referrals, solicitation, etc. (Compl. ¶ 41.) Rather than performing the contracted-for services, The Achievable's alleged sole purpose was to suck money out of Allegro and consumers who signed up for Allegro's debt elimination services. (Compl. ¶ 42.)

Within relatively short order, and after a meteoric rise during which millions of dollars passed through Allegro, Nelms came to the attention of the Alabama Securities Commission, which brought suit against Allegro and Nelms in the Circuit Court of Autauga County, Alabama for violations of the Alabama Sale of Checks Act and the Alabama Deceptive Practices Act.[4] The court issued a permanent injunction, seized Allegro's and Nelms's assets, and installed a receiver to take charge of the business. In addition, the Alabama Supreme Court suspended Nelms's law license for three years.

Nelms's Chapter 7 petition quickly followed. As part of the Trustee's duties both to

---

[4] *State of Ala. & Ala. Sec. & Exch. Comm'n v. Allegro Law, LLC & Allegro Fin. Servs., LLC & Keith Anderson Nelms*, No. CV-09-125 (Autauga Cnty. Cir. Ct.).

the unsecured creditors of the Estate and to the Estate itself, the Trustee filed the Complaint that is the subject of The Achievable's motion to compel arbitration. The arbitration clause at issue states:

> All claims or actions for redress of a breach of this Agreement, except to the extent of any claim or action for equitable relief, shall be made and heard only through arbitration proceedings that are to be conducted under the auspices and according to the rules of the Commercial Division of the American Arbitration Association, with such claim to be heard by a single attorney arbitrator experienced with the subject matter of this type of Agreement. The arbitrator's ruling shall be final, shall do no more than apply the terms of this Agreement as written, and shall be enforceable in any court of competent jurisdiction . . . .

(Arbitration Agreement (Doc. # 2-4, at ¶ 12.4).)

## II.  STANDARD OF REVIEW

Pursuant to the Federal Arbitration Act ("FAA"), a written arbitration provision in a "contract evidencing a transaction involving [interstate] commerce" is "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA evinces a "liberal federal policy favoring arbitration agreements." *Hill v. Rent-A-Center, Inc.*, 398 F.3d 1286, 1288 (11th Cir. 2005) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)); *see also Picard v. Credit Solutions, Inc.*, 564 F.3d 1249, 1253 (11th Cir. 2009) ("The FAA creates a strong federal policy in favor of arbitration."). "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone*, 460 U.S. at 24-25. Accordingly, the courts "rigorously enforce" arbitration agreements. *Klay v. All*

*Defendants*, 389 F.3d 1191, 1200 (11th Cir. 2004). The FAA provides that "upon any issue referable to arbitration under an agreement in writing for such arbitration," and "upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement," the court "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3.

Where a contract contains an arbitration clause, "there is a presumption of arbitrability in the sense that '[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.'" *AT&T Tech. Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 651 (1986) (quoting *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582-83 (1960)). Arbitration is, however, a matter of contract; thus, "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers of Am.*, 363 U.S. at 582. Ultimately, "[t]he question whether the parties have submitted a particular dispute to arbitration, *i.e.*, the 'question of arbitrability,' is 'an issue for judicial determination [u]nless the parties clearly and unmistakably provide otherwise.'" *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (quoting *AT&T Tech. Inc.*, 475 U.S. at 649). In determining which claims are arbitrable, the court looks to the intent of the parties, and in so doing, gives full effect to all provisions in the contract. *Redmon v. Soc'y*

*& Corp. of Lloyds*, 434 F. Supp. 2d 1211, 1218 (M.D. Ala. 2006) (citing *Bullock v. United Benefit Life Ins. Co.*, 165 F. Supp. 2d 1259, 1261 (M.D. Ala. 2001)).

### III.  DISCUSSION

A.  **Lack of an Executed Arbitration Agreement**

As part of the record on appeal, The Achievable submitted an affidavit of Timothy McCallan (Doc. # 2-4), the owner and chief executive officer of The Achievable. As an attachment to McCallan's affidavit, The Achievable submitted an unexecuted agreement entitled "Model Advertising Services Agreement." (McCallan Aff. ¶ 3.) McCallan further states that, "[o]n information and belief, The Achievable, Inc., entered into a written agreement with Allegro Law, LLC, . . ., and the agreement contained an arbitration clause that was substantially identical to the arbitration clause contained in Section 12.4 of the Model Agreement." (McCallan Aff. ¶ 5.) No reason is given for the unavailability of an executed and original version of the supposed agreement.

Arbitration must proceed by written agreement. Thus, the first consideration is to determine whether a valid agreement to arbitrate exists between the parties. The express terms of the FAA require that any such agreement be "in writing." 9 U.S.C. § 3. Where the issue is whether the parties have a valid and enforceable agreement to arbitrate, courts apply the contract law of the state governing the agreement. *Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1368 (11th Cir. 2005); *see also Banks v. Mitsubishi Motors Credit of Am., Inc.*, 435 F.3d 538, 540-41 (5th Cir. 2005). Neither party disputes that Alabama law applies.

Alabama law does not require the original signed and executed contract to prove the existence of the arbitration agreement found therein. To prove the contents of writings where the original is not available, Alabama Rule of Evidence 1004(1) states: "The original is not required, and other evidence of the contents of a writing is admissible, should there be no duplicate readily available, if . . . [a]ll originals are lost or have been destroyed, unless the proponent lost or destroyed them in bad faith[.]" *Id.*

However, in order to admit secondary evidence to prove the contents of the writing, Alabama law requires that the court be reasonably satisfied that the original has, in fact, been lost or destroyed. *See, e.g., Wesson v. McCaffrey*, 601 So. 2d 73, 75 (Ala. 1992) (stating that "[i]f the original is not available, the party *must* satisfactorily account for its absence" prior to offering secondary evidence); *see also* William A. Schroeder & Jerome A. Hoffman, *Alabama Evidence* § 10:9 & n.1 (3d ed.) (collecting cases). Assuming there is no direct evidence that the original is lost or destroyed, a party may prove loss or destruction circumstantially, by evidence that a diligent search has failed to unearth the original document. The Alabama Supreme Court has stated that proof of a "[s]earch is not enough. There must be a diligent search at every place the paper would be likely to be found." *Wiggins v. Stapleton Baptist Church*, 210 So. 2d 814, 819 (Ala. 1968).

McCallan's affidavit comes nowhere close to satisfying Alabama law regarding secondary evidence to prove the contents of a writing. McCallan merely states that "[o]n information and belief," there is an executed version of the agreement that is substantially

7

identical. McCallan offers no reason why the original is not being offered, does not acknowledge that the original is lost or destroyed or is otherwise unavailable, and does not state that a diligent search has been conducted for the document.[5] Such showings are conditions precedent to a court's consideration of secondary evidence. *Wesson*, 601 So. 2d at 75. Because The Achievable has failed to make these showings, the Court cannot consider the secondary evidence, which includes the unexecuted contract and arbitration provision. Accordingly, The Achievable has failed to prove the existence of an agreement to arbitrate, and the bankruptcy judge's denial of arbitration is due to be affirmed on this ground.

**B.   Inherent Conflict Between FAA and Bankruptcy Code**

Assuming that the affirmative requirements for enforcement of the Arbitration Agreement are present in this case – (1) a written agreement; (2) a nexus to interstate commerce; and (3) coverage of the claims by the arbitration clause, 9 U.S.C. § 2 – The Achievable's motion to compel arbitration was properly denied for another reason: an inherent conflict with the Bankruptcy Code.

Although "the [FAA], standing alone, [ ] mandates enforcement of agreements to arbitrate[,]" the Supreme Court has observed that "the [FAA] mandate may be overridden by a contrary congressional command." *Shearson/Am. Express, Inc. v. McMahon*, 482 U.S.

---

[5] While not relevant to the insufficiency of McCallan's affidavit, the Court also notes that McCallan has exhausted a great deal of his credibility with the Court. After repeatedly failing to comply with the bankruptcy court's orders, McCallan failed to appear at a hearing at which his presence was court-ordered. A bench warrant issued and he was soon arrested in New Jersey. As of this date, McCallan remains in civil contempt of the bankruptcy court.

220, 226-27 (1987).  "In *McMahon*, the [Supreme Court] promulgated a three factor test in order to determine Congress' intent: '(1) the text of the statute; (2) its legislative history; and (3) whether an inherent conflict between arbitration and the underlying purposes [of the statute] exists.'" *In re Elec. Mach. Enter., Inc.*, 479 F.3d 791, 796 (11th Cir. 2007) (quoting *Davis v. S. Energy Homes, Inc.*, 305 F.3d 1268, 1273 (11th Cir. 2002) (citation to and quotation of *McMahon* omitted)).  Looking to the first two factors, the Eleventh Circuit "[found] no evidence within the text or legislative history that Congress intended to create an exception to the FAA in the Bankruptcy Code." *Id.* (citing *Mintze v. Am. Gen. Fin. Servs., Inc. (In re Mintze)*, 434 F.3d 222, 231 (3d Cir. 2006)); *see also In re Thorpe Insulation Co.*, No. 10-55744, 2012 WL 255231, at *7 (9th Cir. Jan. 30, 2012) (published).  Thus, in the bankruptcy context, the third factor becomes dispositive: "[W]hether an inherent conflict exists between arbitration and the underlying purposes of the Bankruptcy Code." *Id.*  "[T]he burden is on the party opposing arbitration, however, to show that Congress intended to preclude a waiver of judicial remedies for the statutory rights at issue." *McMahon*, 482 U.S. at 226-27.  Although not explicitly stated in the case law, it is self-evident that the "inherent conflict" test requires a balancing of the legislative interests in play in a particular case.

The recognized first step in addressing whether arbitration inherently conflicts with the Bankruptcy Code is to classify the proceeding sought to be arbitrated as core or non-core. *In re Elec. Mach. Enter., Inc.*, 479 F.3d at 796; *see also Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149, 1157, 1161 (3d Cir. 1989) (holding that arbitration of

certain "non-core adversary proceeding[s] [initiated] in a district court" by the debtor's Chapter 11 Trustee did not "seriously jeopardize the objectives of the [Bankruptcy] Code"); *Hooks v. Acceptance Loan Co., Inc.*, No. 2:10cv999, 2011 WL 2746238, at *3 (M.D. Ala. July 14, 2011) (Watkins, C.J.) (unpublished). The core or non-core classification is a means for the courts to determine the importance of the proceeding to the bankruptcy process. In *Hook*s, Chief Judge Watkins made the following observations:

> However, the core/non-core distinction is not dispositive. To this court's knowledge, no court of appeals has ever concluded that arbitration of a non-core proceeding would produce an inherent conflict between the FAA and the Bankruptcy Code. At the same time, both the Fifth and Eleventh Circuits have indicated a willingness to compel arbitration over core proceedings when the party opposing arbitration fails to meet its burden of showing that arbitration of the core proceeding inherently conflicts with the Bankruptcy Code. *See In re Nat'l Gypsum Co.*, 118 F.3d 1056, 1067 (5th Cir. 1997) (conceding that the core/non-core distinction is practical, but finding that it is "too broad" and stating that "[i]t is doubtful that 'core' proceedings, categorically, meet the [*McMahon*] standard"); *In re Elec. Mach. Enter., Inc.*, 479 F.3d at 798-99 ("[E]ven if we were to find that EME's claim against Whiting-Turner constitutes a core proceeding, we find that EME did not sustain its burden under *McMahon* to demonstrate that Congress intended to limit or prohibit waiver of a judicial forum for the type of claim that EME brought against Whiting-Turner . . . . Therefore, even if this dispute is in fact core, it is still subject to arbitration.").

2012 WL 2746238, at *3.

The Achievable and the Trustee have engaged in a war of words over the labeling of the Trustee's claims. By pleading the claims as "Turnover of Estate Property" (Count I) and "Accounting" (Count V), the Trustee styles the claims as core proceedings. The Eleventh Circuit has defined "core" proceedings as "'involv[ing] [ ] right[s] created by the federal

10

bankruptcy law,'" or proceedings "that would only arise in bankruptcy." *In re Elec. Mach. Enter., Inc.*, 479 F.3d at 797 (quoting *Cont'l Nat'l Bank v. Sanchez (In re Toledo)*, 170 F.3d 1340, 1348 (11th Cir. 1999)). By contrast, non-core proceedings do not involve substantive rights created by the bankruptcy law, and are proceedings that could exist outside the bankruptcy context. *Id.*

28 U.S.C. § 157(b)(2) provides a non-exclusive list of core proceedings. One such core proceeding involves "orders to turn over property of the estate." § 157(b)(2)(E). Property of the estate is defined in 11 U.S.C. § 541; causes of action are included as property of the estate. § 541(a)(1); *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 205 n.9 (1983). Turnover proceedings under § 542(a) require entities holding any property of the debtor that the trustee can use under § 363 to turn that property over to the trustee. However, the turnover power of the bankruptcy court is limited to property in the actual or constructive possession of the bankruptcy court, through the debtor. *See, e.g., United States v. Inslaw, Inc.*, 932 F.2d 1467, 1471 (D.C. Cir. 1991) (turnover provisions allow recovery of property that "was merely out of the possession of the debtor, yet remained 'property of the debtor'"). In other words, the turnover provisions cannot be used to liquidate contract disputes or otherwise demand assets when their title is in dispute. *In re Charter Co.*, 913 F.2d 1575, 1579 (11th Cir. 1990) ("Turnover proceedings are not to be used to liquidate disputed contract claims." (citation omitted)).

The Achievable disputes the Trustee's characterization of the claims. The Achievable urges the Court to recognize the Trustee's claims for what The Achievable contends they really are: (1) a breach of contract action; and (2) a motion for discovery related thereto. (Appellant's Br. 6 (Doc. # 7).) The Achievable cites language in the Complaint purporting to show that the gravamen of the Trustee's Complaint (at least is it relates to Counts I and V) is a breach of contract action: The Achievable "[has] collected substantial sums in fees from the Debtors but either have not provided or have not adequately provided the promised services." (Compl. ¶ 48.) The next paragraph states that The Achievable "either [has] not performed or [has] not adequately provided" contracted-for services. (Compl. ¶ 49.) Importantly, The Achievable also disputes the substance of the Trustee's claims in its Answer to the Complaint. (Answer (Doc. # 2-5).)

The label a party attaches to a claim does not require the court to wear blinders as to that claim's true substance. This Court is of the opinion that, in substance, the Trustee's adversary claims – called turnover and accounting proceedings – are actually a breach of contract claim. The allegations in the Complaint, recited above, and the law regarding what constitutes a turnover proceeding, also described above, mandate this conclusion.[6] As an adversary action for breach of contract, the dispute is therefore non-core, and this conclusion

---

[6] Having reached the conclusion that the Trustee's claims are not turnover and accounting proceedings, but instead breach of contract claims, the Court implicitly rejects the Bankruptcy Judge's initial determinations that: (1) the Trustee's action is not within the scope of the arbitration clause because it is not breach of contract claim, (Rec. 11-12); and (2) as equitable actions, the turnover and accounting proceedings are not within the scope of the arbitration clause, (Rec. 12).

suggests that the bankruptcy interests in play are not so important as to override the FAA.

Indeed, no court of appeals has reached the conclusion that arbitrating a non-core proceeding would cause an inherent conflict with the Bankruptcy Code. *Hooks*, 2012 WL 2746238, at *3. However, the courts of appeals are careful not to completely write off this possibility. *See In re Thorpe*, 2012 WL 255231, at *7 ("In non-core proceedings, the bankruptcy court *generally* does not have discretion to deny enforcement of a valid prepetition arbitration agreement." (emphasis added)); *In re Elec. Mach. Enter., Inc.*, 479 F.3d at 796 ("*In general*, bankruptcy courts do not have the discretion to decline to enforce an arbitration agreement relating to a non-core proceeding." (emphasis added)); *In re Crysen/Montenay Energy Co.*, 226 F.3d 160, 166 (2d Cir. 2000) (stating that non-core proceedings are unlikely to present a conflict sufficient to override the presumption in favor of arbitration (citing and quoting *In re United States Lines, Inc.*, 197 F.3d 631, 640-41 (2d Cir. 1999))); *see also Hooks*, 2012 WL 2746238, at *3 (stating that "the core/non-core distinction is not dispositive"). Accordingly, this Court's inquiry regarding an inherent conflict between the FAA and the Bankruptcy Code does not end with the conclusion that the Trustee's causes of action present a single non-core breach of contract claim.

Although classified as a non-core proceeding, the unique set of facts presented in this case, when considered in the aggregate, compel the Court to the conclusion that arbitration of this dispute would seriously disturb the objectives of the Chapter 7 bankruptcy.

The first unique factor involves a second look at what is considered to be a non-core

13

proceeding. As stated above, non-core proceedings are proceedings that could exist outside the bankruptcy context. *In re Elec. Mach., Inc.*, 479 F.3d at 797. Given the alleged and, to this point, factually-supported collusive nature of the McCallan and Allegro relationship, and the lack of arms-length dealing, the reality is that a breach of contract action on this contract, between The Achievable and Allegro, would not have materialized but for the Trustee's initiation of it in his role as representing the interests of the Estate's creditors. In other words, the proceeding, as a practical matter, would not exist outside bankruptcy. Although this truth does not reformulate the proceeding into a core proceeding, it does shed light on which of the Trustee's two duties (to duty to the estate's creditors) is being exercised in this case.

One question a Court should ask itself when weighing the bankruptcy and arbitration interests is whether arbitration of the proceeding would cause substantial detriment to the creditors of the estate. After all, protecting the creditors of the debtor is one of the chief objectives of the bankruptcy process. A number of considerations – legal, practical, equitable – convince this Court that the consumer creditors of Allegro would not be adequately protected by arbitrating this proceeding.

The first consideration is the importance of this proceeding to the Chapter 7 bankruptcy case. Although The Achievable is correct to state that possible inefficiency is not a sufficient ground for finding an inherent conflict, this case presents much more than the mere inefficiency of a bifurcated proceeding. *See Dean Witter Reynolds, Inc. v. Byrd*, 470

U.S. 213, 217 (1985) (holding that arbitrable claims are to be submitted to arbitration "even where the result would be the possibly inefficient maintenance of separate proceedings in different forums"); *see also In re Friedman's, Inc.*, 372 B.R. 530, 542-43 (S.D. Ga. May 24, 2007) (applying *Dean Witter* in bankruptcy context and collecting cases). The allegations in the Complaint are that the McCallan entities claimed the lion's share of the money passing from the thousands of Allegro customers to Allegro. Many millions of dollars remain unaccounted for despite the lengthy pendency of this adversary proceeding. In fact, McCallan's recalcitrance, discussed above and below, has manifested itself primarily with regard to the bankruptcy court's attempts to find out where and how much money was siphoned from Allegro. Comparing the potential collective value of these claims to the rest of the bankruptcy estate, it is evident that these claims form the tail that wags the dog of this bankruptcy case. Arbitration of the Trustee's claims against McCallan and his entities would substantially handicap the Bankruptcy Court in achieving the objectives of a Chapter 7 proceeding: to collect, liquidate, and disperse all of Nelms's assets. Moreover, this concern is especially heightened when there are strong indications that McCallan and his entities will not fully engage themselves in the arbitration. In short, an ineffective arbitration has the potential to thwart the entire bankruptcy process in this case.

McCallan has proven himself contemptuous to compulsory court orders throughout the bankruptcy process. McCallan's stonewalling regarding these adversary claims has caused one set of lawyers to withdraw from his representation (of him and his entities), and

whatever cooperation to date has been while in civil contempt and under the threat of criminal contempt punishment. From a practical viewpoint, and considering the importance of this adversary proceeding to the successful administration of the bankruptcy estate, the Court must ask itself whether the arbitration forum would adequately protect the creditors of the estate, and thereby the larger bankruptcy process. All indications are that, once the dispute is out of the Court's control, McCallan will take advantage of the lessened authority of the arbitrator in order to frustrate the proceeding. Arbitrators simply lack the full complement of mechanisms designed to ensure a party's compliance in reaching a full and fair resolution of a dispute, and resort to those mechanisms (contempt) has proven necessary in this case. The result of McCallan's litigation conduct is two-fold. First, the bankruptcy interests are heightened because of the demonstrated need for the court's powers of compulsion in order to protect the interests of the consumer creditors. This proceeding is critical to resolving Nelms's bankruptcy petition (in which there are thousands of individual creditors), and the likelihood that the arbitration forum will be abused makes the risk of sending this case to arbitration intolerable. Second, the interests in enforcing this particular arbitration agreement are lowered significantly in this case, when the party seeking the arbitration forum will utilize it as a bad-faith means to shirk liability.

Finally, forcing the consumer creditors (through the Trustee) to arbitrate pursuant to the formative document of an alleged civil fraud conspiracy, the sole purpose of which was to defraud these very consumers, would be fundamentally unfair. This Court does not wish

to perpetuate the conspiracy by forcing the Allegro consumers – through the Trustee – to arbitration under the contract.

In summary, even assuming there to be a valid arbitration agreement between The Achievable and Allegro, the extraordinary facts presented in this case lead the Court to the conclusion that arbitrating the Trustee's claims against The Achievable would produce an inherent conflict with the Bankruptcy Code, thereby vesting the Court with discretion to deny arbitration.

### IV. CONCLUSION

In conclusion, The Achievable has failed to prove the existence of a valid agreement to arbitrate. However, assuming that such an agreement exists, the motion to compel arbitration was properly denied on account of an inherent conflict between the bankruptcy and arbitration interests presented in this case. Accordingly, and for the reasons stated above, it is ORDERED that the decision of the bankruptcy judge is AFFIRMED. It is further ORDERED that the oral argument, set for May 1, 2012, is CANCELLED. The Clerk of the Court is DIRECTED to terminate the appeal and close this case. The case is REFERRED back to the Bankruptcy Court.

DONE this 23rd day of April, 2012.

/s/ Mark E. Fuller
UNITED STATES DISTRICT JUDGE